Frank E. Marchetti (SBN 203185)
**MARCHETTI LAW**
3600 Wilshire Blvd., Ste. 2036
Los Angeles, CA 90010
Telephone: (626) 676-6377
Facsimile: (626) 628-3208
Email: frank@marchettilaw.com

Attorney for Plaintiffs/Creditors VERONICA GAMM,
MARINA NOORALI, and FREDY U. HARRISON

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>ERIC RODRIGUEZ<br><br>                    Debtor.<br>_____<br>VERONICA GAMM, MARINA NOORALI,<br>FREDY U. HARRISON,<br><br>                    Plaintiffs,<br><br>    vs.<br><br>ERIC RODRIGUEZ<br><br>                    Defendant | CASE NO.:    1:18-bk-13040-MT<br><br>Chapter 13<br><br>Adv. No.<br><br>**COMPLAINT TO DETERMINE DEBTS TO BE NON-DISCHARGEABLE PURSUANT TO SECTION 1328(A)(4) OF THE BANKRUPTCY CODE; DEMAND FOR TRIAL BY JURY** |

   Plaintiffs/Creditors VERONICA GAMM, MARINA NOORALI, and FREDY U. HARRISON by and through their attorneys herein, respectfully submit the following Complaint to Determine Debt to be Non-Dischargeable pursuant to Section 1328(a)(4) of the Bankruptcy Code. As grounds in support, PLAINTIFFS aver and state as follows:

**I.**

**PARTIES, JURISDICTION AND VENUE**

   1.    Defendant ERIC RODRIGUEZ (hereinafter referred to as "RODRIGUEZ" or

**Complaint**
1

"DEFENDANT") is an individual who may be served with process by First Class United States Mail, postage prepaid, mailed to the attention of RODRIGUEZ at his residence at 11460 Prager Ave., Lake View Terrace, CA 91342, pursuant to Rule 7004(b)(1) of the Federal Rules of Bankruptcy Procedure.

2. VERONICA GAMM (hereinafter "GAMM") is an individual residing in the County of Los Angeles, State of California.

3. MARINA NOORALI (hereinafter "NOORALI") is an individual residing in the County of Los Angeles, State of California.

4. FREDY U. HARRISON (hereinafter "HARRISON") is an individual residing in the County of Los Angeles, State of California.

5. The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

6. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I).

7. Venue in this district is proper pursuant to 28 U.S.C. §§1408 and 1409.

8. This Court has personal jurisdiction over the Defendants pursuant to Rule 7004 of the Federal Rules of Bankruptcy Procedure.

## II.

## PROCEDURAL BACKGROUND

9. GAMM, NOORALI and HARRISON (collectively "PLAINTIFFS") were employed by RODRIGUEZ's restaurant Valley Wing Pit, LLC in 2012. RODRIGUEZ was PLAINTIFFS' manager and an owner of Valley Wing Pit, LLC. RODRIGUEZ did not respect the corporate formality of Valley Wing Pit, LLC and treated the company as an alter ego.

10. During their employment at Valley Wing Pit, LLC, PLAINTIFFS were harassed, assaulted, discriminated against, and had their wages stolen, among other wrongs, all at the hands of RODRIGUEZ.

11. On October 22, 2013, PLAINTIFFS filed a lawsuit against RODRIGUEZ, his co-owner/manager AJ Blanco, and Valley Wing Pit, LLC. for violations of the Fair

Employment & Housing Act, California's Labor Code, discrimination, harassment, wrongful termination, conversion of wages, assault and battery. (Los Angeles Superior Court, Case No. BC525366). The lawsuit alleged that RODRIGUEZ was liable based both on his personal involvement in the tortious wrongdoings as well as due to his being the alter-ego of Valley Wing Pit, LLC.

12. RODRIGUEZ and the other defendants in the underlying action appeared in the underlying action and filed an Answer generally denying all claims. However, when they failed to respond to discovery and failed to comply with court orders compelling them to respond to discovery, the Court struck their Answer and entered their defaults.

13. On November 25, 2015, the underlying court entered a Judgment against RODRIGUEZ and the other defendants, jointly and severally, in the total amount of $111,881.73 for PLAINTIFFS.

14. On or around December 20, 2018, RODRIGUEZ filed a voluntary petition for relief under Chapter 13 of Title 11 of the United States Code in this Court.

15. The Court set February 28, 2019 as the bar date for claims. The Court set April 22, 2019 as the deadline to file complaints to challenge the dischargeability of certain debts.

### III.
### GENERAL ALLEGATIONS

16. RODRIGUEZ and AJ Blanco were the principals of Valley Wing Pit, LLC, which owned and operated a sports-themed bar/restaurant named the Valley Wing Pit Sports Bar & Grill located at 1245 San Fernando Road, San Fernando, California 91340.

17. The restaurant opened on November 29, 2012. Defendants hired Plaintiffs to work in the restaurant, and each of the PLAINTIFFS began working before the restaurant opened.

#### A. FACTS REGARDING VERONICA GAMM

18. GAMM was hired to work at the Valley Wing Pit in September of 2012 to be a

**Complaint**
3

|   |   |
|---|---|
| | waitress, although they gave her the title of "floor manager". In reality, her primary duty was to serve customers, but she had more experience than the other waitresses so they gave her a higher title. They said that they would pay her $8.00 per hour. |
| 19. | The restaurant was not yet open to the public at the time that they hired GAMM. However, Defendants required her to work on two days in September, three days in October and six days in November, so that she could be trained to work at the restaurant. Her attendance on these dates was mandatory. On the 11 days that she worked before the restaurant opened, Defendants provided no way for GAMM to "punch a clock" or otherwise keep track of her time, and she did not record her hours. To the best of her recollection, she worked an average of 8 hours each of these days. Defendants did not pay GAMM for any of these hours worked, telling her that they did not pay for training. |
| 20. | In late September or sometime in October of 2012, GAMM called RODRIGUEZ to ask about when the restaurant would be opening and how the health inspections were progressing. RODRIGUEZ responded that the opening date was getting close and said to GAMM "I'm so excited that you and Michelle are going to give me a sexy dance in the office when we open." Michelle was another waitress who had been hired to work at the restaurant. GAMM was taken aback by RODRIGUEZ's statement and could not believe that he was implying that she was going to do a "sexy dance" or anything other than work as a waitress. She responded that she would not be dancing and that she would only be selling beer and food for the business. |
| 21. | NOORALI was GAMM's direct manager, and after RODRIGUEZ made this statement, GAMM complained about it to NOORALI. RODRIGUEZ's partner and co-owner AJ Blanco was with NOORALI at the time that GAMM complained about RODRIGUEZ's comments, and GAMM told both of them that she was very offended by RODRIGUEZ's statement and his apparent presumption that she was going to be doing something more than waiting on customers. They assured GAMM that she just needed to do her job and they would speak with RODRIGUEZ to ensure that he did |

1  not make any more comments like that.

2  22.  Leading up to the opening of the restaurant, NOORALI took pictures of each of the waitresses in their uniforms (a short skirt and tight top).  RODRIGUEZ specifically asked NOORALI to give him a copy of GAMM's picture.  NOORALI refused to give him a copy.  RODRIGUEZ then went directly to GAMM and demanded a copy of her photo.  She complied because he was her boss.  When she handed him the photo, he said something to the effect "Wow, you are hot!"  GAMM felt creeped out and bothered that he was again making comments like this to her, and she immediately reported it to NOORALI.

23.  On December 8, 2012, GAMM was scheduled to work from 1:00 p.m. to closing, so she arrived at around 12:45 p.m. and she went to the office to prepare to start her shift.  Before going to work, she had applied medical tape to her knees and back because they were sore and she had found that the tape helped her manage the pain.  While she was in the office, RODRIGUEZ came into the office and, without warning, ripped the tape off of the skin of GAMM's knee, causing her to screamed out in shock, pain, surprise and anger.  GAMM told him he could not do that and that she needed the medical tape in order to deal with the pain in her knee and back.  RODRIGUEZ laughed and acted like he did not care about what GAMM was saying.  GAMM was very upset and her eyes began tearing up.  When RODRIGUEZ noticed this he then acted a little more sincere and apologized.  GAMM said "what am I going to do now?", and Ms. Rodriguez criticized her for not bringing a replacement supply of medical tape, as if GAMM should have anticipated him ripping it off of her leg.  She was still very upset and she asked him to leave her alone while she finished getting ready for her shift.  RODRIGUEZ then stormed off and went into the kitchen.  Before starting her shift, GAMM complained about RODRIGUEZ's conduct to Mr. Blanco, NOORALI and some of my co-workers.

24.  On that same night, after the restaurant had closed and towards the end of GAMM's shift, GAMM was in the office with other waitresses adding up tips when

|   |   |   |
|---|---|---|
| 1 |  | RODRIGUEZ entered in a clearly intoxicated and belligerent state.  He put his arms |
| 2 |  | around GAMM and hugged her while she was trying to count the tips.  While |
| 3 |  | hugging GAMM, RODRIGUEZ then moved his hand down her back to her buttocks |
| 4 |  | and left it there until she was able to break out of his grasp and get away from him. |
| 5 |  | She yelled at him and he left the office.  She immediately found NOORALI and told |
| 6 |  | her what RODRIGUEZ had done. |
| 7 | 25. | Still later on that same night, GAMM was still in the office when RODRIGUEZ |
| 8 |  | came back into the office.  This time she was alone.   RODRIGUEZ was still visibly |
| 9 |  | intoxicated, and he started to scream and swear at GAMM, saying that he didn't like |
| 10 |  | her "fucking attitude" and that she was "being a bitch".  GAMM stood up for herself |
| 11 |  | and told him to leave and sober up, but he refused and continued to yell at her.  She |
| 12 |  | told RODRIGUEZ that she was still upset that he assaulted her at the beginning of |
| 13 |  | her shift when he ripped the medical tape off of her skin, and he responded "You're |
| 14 |  | making shit up".  Before the situation escalated further, NOORALI came into the |
| 15 |  | office and RODRIGUEZ stormed off and went home.  GAMM immediately reported |
| 16 |  | and complained to NOORALI about what had occurred. |
| 17 | 26. | RODRIGUEZ thereafter instructed NOORALI that he wanted GAMM removed from |
| 18 |  | the schedule.  He claimed that GAMM had lied about RODRIGUEZ tearing the tape |
| 19 |  | off of her knee and he stated that he was going to pull the footage from the security |
| 20 |  | cameras to prove it. |
| 21 | 27. | GAMM returned to the restaurant on December 11, 2012 to meet with RODRIGUEZ, |
| 22 |  | Mr. Blanco and NOORALI.  During the meeting, she continued to complain about |
| 23 |  | RODRIGUEZ's repeated harassment and how he had touched her.  When GAMM |
| 24 |  | complained about this, RODRIGUEZ became visibly upset, and he stated that he |
| 25 |  | would review the security tapes and that he would fire GAMM once he proved that |
| 26 |  | he had not touched her.  GAMM told him that he wouldn't be able to fire her because |
| 27 |  | he had done it twice, first when he ripped off the tape and the second time when he |
| 28 |  | hugged her and grabbed her buttocks (in front of witnesses) and the tapes should |

**Complaint**
6

show it. Mr. Blanco then interrupted and told NOORALI and GAMM to leave the office so that RODRIGUEZ could calm down.

28. Defendants never actually told GAMM that her employment was ended, but they also never put her back on the schedule. For her part, she did not feel that she could return to work because after so many incidents, she felt that RODRIGUEZ would not stop. GAMM felt that if she returned to work, she would again be verbally and/or physically harassed and assaulted by RODRIGUEZ. So far as GAMM was concerned, December 8, 2012 was the end of her employment.

29. Defendants never paid GAMM anything for any of the work she did. After December 8, 2012, GAMM told NOORALI and Mr. Blanco that she needed to be paid her wages, and NOORALI said she would try to get GAMM paid, but nothing came of it. To this day, GAMM has never been paid for the time that she worked for Defendants. They even collected and never paid out to her the tips that she had earned.

30. Thus, between November 29, 2012 and December 8, 2012 GAMM worked 55.15 hours of regular time, 11.82 hours of overtime and 1.65 hours of double-time. At $8.00/hour, GAMM should have been paid $766.25, but she was paid nothing. This is in addition to the 88 hours that she worked in training before the restaurant opened, for which she was never paid, and for which she should have been paid $704.00 (88 hours times $8.00/hour)

31. Not once during GAMM's employment by Defendants did she receive an uninterrupted 30 minute meal break. The restaurant was very busy and under-staffed, to the point that GAMM had to eat in between servicing customers and she never received an actual break.

32. Despite looking for work and applying at many locations, GAMM was not able to find new employment until mid-February of 2013. At that time, she began working at another restaurant, earning $8.00/hour plus shared tips. As a result of Defendants' conduct, GAMM was unemployed for over two months and lost $2,560.00 in income

Brief.

(40 hours/week times 8 weeks times $8/hour.)

33. The harassment that GAMM received from RODRIGUEZ made working at the restaurant a very stressful job because she realized early on that RODRIGUEZ did not respect her, that he would demean her and that she had to be on guard around him so that he did not take advantage of her. It caused her to suffer stress at work, and even after-hours when she should have been home relaxing. GAMM became stressed, nervous and anxious about having to go into work because she didn't know what new challenge she would have to deal with to get through the day. After December 8, 2012, GAMM needed to work in order to have income to live, but the stress of working in that environment was too great to deal with it. For the next three months, she was constantly stressed about finding new employment and finding income to support herself. She had headaches, couldn't sleep, felt anxious, and lost her appetite. She found herself not trusting anyone - especially male supervisors/managers at potential places of employment where she applied for new work. She was desperate for money, but Defendants wouldn't even send her paycheck for the hours she had worked. Even after she found new employment, she continued to be distressed by how she had been treated by Defendants, and she had built up a lot of debt during her period of unemployment that she stressed about paying off. Over time, the stress that GAMM attributed to working for Defendants has slowly diminished, though she still has distressful memories triggered of the day RODRIGUEZ hugged and fondled her.

## B. FACTS REGARDING MARINA NOORALI

34. NOORALI was hired by Defendants on June 26, 2012 to work as the General Manager for the Valley Wing Pit starting the week of July 4, 2012. She was to help them open the restaurant and hire staff, and once the restaurant opened run the restaurant as the general manager. Defendants agreed to pay NOORALI a monthly salary of $2,500 until the restaurant opened, and to thereafter pay her a monthly salary of $3,000 plus a bonus of 5% of receipts over $100,000 per month.

35. Before the restaurant opened, Defendants provided no way for NOORALI to "punch a clock" or otherwise keep track of her time, and she did not record her hours. NOORALI worked an average of 8 hours per day, 5 days per week before the restaurant opened on November 29, 2012.

36. Despite their agreement to pay NOORALI $2,500/month before opening and $3,000/month after opening, Defendants actually paid her only $500 in the first week of August, $900 on November 31, 2012, and $700 on December 11, 2012. NOORALI repeatedly complained that she was not being paid, but Defendants only assured her that they would eventually pay her in full and that she should be patient.

37. From the opening of the restaurant on November 29, 2012, through the last date of NOORALI's employment on December 14, 2012, she worked every single day - 16 days in a row. Defendants provided no way for her to "punch a clock" or otherwise keep track of her time, and she did not record her hours since she was salaried. However, to the best of her recollection, NOORALI worked at least 16 hours each day, typically 10am to 2am, though some days she worked more. For example she worked from 9am to 4 am on November 29, 2012. To the best of her recollection, NOORALI worked at least 300 hours during those 16 days. She never received an uninterrupted 30 minute meal period.

38. During the initial months of her employment, NOORALI had no issues with the behavior of Defendants - other than their failure to pay her wages. However, approximately one month before the restaurant opened, the mood among the owners became very tense. Once the restaurant opened, RODRIGUEZ became downright abusive. He would call NOORALI on an almost daily basis to yell and scream at her. Additionally, he violated company policy (that he agreed to before the restaurant opened) by drinking to a point of intoxication and then entering the back office/management area of the restaurant. He continuously and repeatedly cursed and yelled at NOORALI and other employees, especially after he had been drinking, which was frequent. NOORALI complained about this to Eric Rodriguez's partner

|   |     |   |
|---|-----|---|
| 1 |     | AJ Blanco, since they were both jointly her boss, but Mr. Blanco did nothing and appeared unable to do anything to keep his partner in check. |
| 3 | 39. | In late September or sometime in October of 2012, NOORALI received a complaint from Veronica Gamm about a conversation she had with Eric Rodriguez. As discussed above, GAMM told NOORALI that RODRIGUEZ said that he expected her and another waitress to perform a "sexy dance" for RODRIGUEZ in the office once the restaurant opened, and NOORALI assured GAMM that this would not be something required of her. NOORALI then spoke with Messrs. Rodriguez and Blanco about GAMM's complaint and how statements like that could be construed to be harassment and needed to stop. Mr. Blanco appeared to understand the concerns, but RODRIGUEZ had an attitude that he could do whatever he wanted. |
| 12 | 40. | As also mentioned above, NOORALI took pictures of the waitresses in their uniforms before the opening of the restaurant, and when RODRIGUEZ learned of this, he asked NOORALI specifically for a copy of the photograph of GAMM. Given his relatively recent comments about GAMM, NOORALI felt it best to refuse his demand and she cautioned him that he needed to stay away from GAMM and treat her with respect. He became very angry with NOORALI, and cursed at her, and called her insubordinate, but she still refused to give him a copy of GAMM's photo. When GAMM later reported that RODRIGUEZ had requested the photo directly from her and made the comment "Wow, you're hot", NOORALI assured GAMM that NOORALI was aware of RODRIGUEZ's behavior and that she would do everything within her power to stop him from engaging in further similar activity. By that time, though, she was not sure what she could do. NOORALI spoke again with RODRIGUEZ and Mr. Blanco about RODRIGUEZ's treatment of GAMM. RODRIGUEZ responded by swearing at NOORALI and stating she was out of line telling him, the owner, what he could and could not do. |
| 27 | 41. | As further mentioned above, on December 8, 2012, GAMM complained again to NOORALI about RODRIGUEZ, this time regarding his tearing medical tape off of |

**Complaint**
10

|   |   |   |
|---|---|---|
| 1 | | her knee.  GAMM appeared to be very upset and nearly crying about the fact that |
| 2 | | RODRIGUEZ had assaulted her in this way, not only due to the physical contact but |
| 3 | | also because she felt that she needed the tape on her knee and she did not have any |
| 4 | | more with her to replace it.  NOORALI immediately discussed this incident with Mr. |
| 5 | | Blanco.  Then in the evening, GAMM again came to NOORALI very upset, and told |
| 6 | | her about RODRIGUEZ grabbing her buttocks and  touching another female |
| 7 | | employee (Precilla) inappropriately too.  NOORALI confronted RODRIGUEZ soon |
| 8 | | thereafter, however RODRIGUEZ was still intoxicated and lashed out at NOORALI |
| 9 | | with angry and loud cursing in response to NOORALI telling him to leave GAMM |
| 10 | | and the other waitresses alone and respect the rules they had put in place. |
| 11 | 42. | That night, RODRIGUEZ texted NOORALI and told her to take GAMM (whom he |
| 12 | | referred to as "Barbie") off the schedule for the next week.  He stated that he wanted |
| 13 | | to pull the security camera footage to prove that GAMM was lying about him. |
| 14 | | NOORALI followed his instructions and took GAMM off of the schedule for the next |
| 15 | | week. |
| 16 | 43. | On December 11, 2012, Mr. Blanco asked NOORALI to have GAMM come in for a |
| 17 | | meeting to resolve the ongoing issued between her and RODRIGUEZ, so NOORALI |
| 18 | | contacted GAMM and set up a meeting for later that day.  Mr. Blanco told |
| 19 | | NOORALI that just he and RODRIGUEZ were going to meet with GAMM, but |
| 20 | | NOORALI insisted on also sitting in on the meeting since she was the general |
| 21 | | manager and she needed to know if one of her employees was making false |
| 22 | | accusations.  When GAMM came for the meeting, it quickly became apparent that |
| 23 | | RODRIGUEZ had still not gotten the video footage from the camera.  GAMM |
| 24 | | repeated her accusations that RODRIGUEZ had assaulted her at the beginning and |
| 25 | | end of her shift and she demanded to see the video.  RODRIGUEZ responded that he |
| 26 | | still had not reviewed the tapes, and that he was going to fire GAMM after he did. |
| 27 | | RODRIGUEZ became very angry, belligerent and was swearing at GAMM, until Mr. |
| 28 | | Blanco told NOORALI to take GAMM out of the room so that Mr. Blanco could |

calm RODRIGUEZ down. GAMM was clearly also very upset and NOORALI sent her home with a promise to look into what happened and to get her back on the schedule as soon as possible.

44. However, later that day when NOORALI told RODRIGUEZ that she also wanted to review the video, he again became angry and swore at her and told her to mind her own business. He told NOORALI that she needed to readjust her loyalties and stop trying to help GAMM or else she would be out of a job too. NOORALI never saw the video, or even heard whether or not RODRIGUEZ had reviewed it. From that point in time, RODRIGUEZ treated NOORALI with complete disrespect (even worse than normal) and yelled at her and swore at her multiple times every day. He made what was already a very stressful job now unbearable.

45. On December 14, 2012, NOORALI was working in the office when RODRIGUEZ came in, yet again clearly intoxicated and belligerent. He yelled at NOORALI "You are sitting on your ass and I am paying you! Get the fuck up and go out to see what the customers are complaining about!" NOORALI ran out of the office, in part to get away from him as well as to check on the customers, but all customers appeared to be fine and happy and she could not find anyone with any complaints. She next found RODRIGUEZ in the kitchen yelling at the cooks "Fuck you guys. You are making me lose money and I am paying you. Fuck! Fuck! Fuck!" He was so loud that the customers could hear his outburst and they were trying to look through into the kitchen. NOORALI was incredibly embarrassed, but she was too scared to confront him further and tell him to stop yelling at the cooks. The constant yelling and abuse from RODRIGUEZ had made the restaurant a hostile work environment and she could not deal with it anymore. She left work that night and refused to return.

46. RODRIGUEZ's constant yelling and swearing at NOORALI had a severe toll on her well being. She had dedicated myself to the job and took a big leap of faith that this new restaurant would be successful, and that she would be successful with it. She worked excessive hours because she wanted it to be successful, and she even

worked when they failed to pay her as promised because she believed that if she helped make the restaurant successful, everything would work out in the end and she would be paid everything she had been promised.  However, the constant onslaught of abuse at the hands of RODRIGUEZ was too much for Ms Noorali.  She became depressed, anxious, could not sleep even though she felt exhausted, could not eat and became withdrawn from my friends and family.  NOORALI could not pay her bills and that further increased her depression.  She had headaches every day and her stomach was very upset.

47. After being constructively terminated by the hostile work environment, NOORALI tried to find new employment but was not able to for six months.  Even after she found new employment, she continued to be depressed and anxious.  The lack of pay while working for Defendants and during the six months thereafter caused her to incur significant debt which she has still not been able to pay off, which stresses her out whenever she receives bills in the mail  that she doesn't know how to pay for.

### C.  FACTS REGARDING FREDY HARRISON

48. HARRISON was hired by Defendants in early June of 2012 to work at the Valley Wing Pit as a head chef.  He was told that the restaurant would be opening in August of 2012, and they agreed to pay him $15.00/hour.  He was one of their first employees and the first management team member.  Although he was hired to the position of head chef, Defendants assigned him many duties before the restaurant opened that had nothing to do with his job description, including demolition/construction, buying kitchen supplies and food, selecting and establishing relationships with vendors, hiring kitchen staff, and preparing menus for the restaurant.

49. Before the restaurant opened, Defendants provided no way for HARRISON to "punch a clock" or otherwise keep track of his time, and he did not record his hours.  To the best of his recollection, he worked 42 days (averaged 7 days per month) between his hiring in June through the opening of the restaurant on November 22,

|   |   |   |
|---|---|---|
| 1 |  | 2012.  He averaged 8 hours per day during this time.  Defendants did not pay him |
| 2 |  | anything for all of this work, and instead promised that they would pay him in full |
| 3 |  | once the restaurant opened. |
| 4 | 50. | HARRISON had repeatedly complained that Defendants were not paying him, and |
| 5 |  | accepted their delays with greater and greater apprehension each time.  Finally, on |
| 6 |  | December 14, 2012, they yet again failed to pay him even though he'd been promised |
| 7 |  | that he would be paid that date.  He realized he could no longer trust them to pay him, |
| 8 |  | so he quit and began looking for a new job. |
| 9 | 51. | During the entirety of his employment, Defendants paid HARRISON only $1,050, in |
| 10 |  | two checks for 35 regular hours (no overtime) each. |

## IV.

## **CLAIM FOR RELIEF**

### **(Pursuant to 11 U.S.C. § 1328(a)(4))**

52. PLAINTIFFS hereby incorporate all of the foregoing allegations as if fully set forth hereat.

53. PLAINTIFFS weres at all relevant times mentioned herein employees within the meaning of California Government Code sections 12940 et seq., protected against harassment, discrimination and retaliation in employment.  GAMM and NOORALI were subjected to harassment, discrimination and retaliation in violation of FEHA.

54. At all relevant times mentioned herein, DEFENDANT was an employer within the meaning of Government Code section 12926, subdivision (d), and as such was prohibited from discrimination, harassment and retaliation in employment decisions as provided in Government Code section 12940 et seq.  DEFENDANT was further required to provide an environment free of discrimination, harassment and retaliation as provided in Government Code section 12940, subdivision (h)(1) and (i).

55. GAMM and NOORALI were harassed, discriminated against and retaliated against in violation of Government Code section 12940, by DEFENDANT engaging in a course of conduct which included subjecting PLAINTIFFS to disparate treatment in

employment and terms and conditions of employment, and resulting in the creation of a hostile work environment and unlawful termination of their employment. DEFENDANTS further assaulted and battered GAMM.

56. The wrongful conduct of DEFENDANT, constituting unlawful employment practices, deprived PLAINTIFFS of secure working conditions free from harassment, discrimination and retaliation. The effect of the practices complained of herein above deprived PLAINTIFFS of equal employment opportunities and otherwise adversely affected their status as employees.

57. RODRIGUEZ directly harassed GAMM and NOORALI and failed to take all reasonable steps to prevent harassment and retaliation of them.

58. RODRIGUEZ acted intentionally and willfully to cause PLAINTIFFS to suffer emotional distress as well as losses in earnings, loss of earning capacity, and other employment benefits along with other incidental and consequential damages and losses, all in an amount to be proven at trial.

59. RODRIGUEZ further converted PLAINTIFFS' wages by failing to pay them for work they performed and failing to meet obligations imposed by the California Labor Code.

60. As the proximate result of RODRIGUEZ's intentional and willful conduct, PLAINTIFFS suffered lost compensation, lost future earnings, severe emotional distress, humiliation and mental anguish, stress, shame, despair, embarrassment, depression, and mental pain and anguish resulting in general and special damages. The trial court in the underlying action accordingly entered judgment against RODRIGUEZ and in favor of PLAINTIFFS totaling $111,881.73.

61. In doing the things alleged herein, RODRIGUEZ acted with oppression, fraud and malice.

62. Pursuant to 11 U.S.C. § 1328(a)(4), RODRIGUEZ's conduct as herein alleged is not dischargeable herein.

63. PLAINTIFFS are entitled to a determination that the resulting monetary damages

awarded to PLAINTIFFS in the underlying action is non-dischargeable pursuant to 11 U.S.C. § 1328(a)(4).

## VI.

## RELIEF REQUESTED

**WHEREFORE**, PLAINTIFFS prays for judgment against as follows:

a.  A determination that the judgment entered in their favor in the underlying action in the amount of $111,881.73 (or such other amount as this Court may determine) is non-discharegable pursuant to 11 U.S.C. §1328(a)(4)

b.  For such other and further relief as this Court may deem proper.

DATED: February 28, 2019               MARCHETTI LAW

                                       /s/ *Frank E. Marchetti*
                                       By:_____
                                       Frank E. Marchetti
                                       Attorney for plaintiffs/creditors VERONICA GAMM,
                                       MARINA NOORALI and FREDY HARRISON

## DEMAND FOR JURY TRIAL

PLAINTIFFs hereby demand a trial by jury.

DATED: February 28, 2019               MARCHETTI LAW

                                       /s/ *Frank E. Marchetti*
                                       By:_____
                                       Frank E. Marchetti
                                       Attorney for plaintiffs/creditors VERONICA GAMM,
                                       MARINA NOORALI and FREDY HARRISON

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

3600 Wilshire Blvd., Ste. 2036, Los Angeles, CA 90010

A true and correct copy of the foregoing document entitled (*specify*): Complaint To Determine Debts To Be Non-Dischargeable Pursuant To Section 1328(A)(4) of the Bankruptcy Code; Demand For Trial By Jury

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 02/28/2019, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

   US Trustee Elizabeth F. Rojas    ustpregion16.sv.ecf@usdoj.gov
   Daniel K. Fujimoto    wdk@wolffirm.com
   Valerie Smith    claims@recoverycorp.com
   Elena Steers    elena@steerslawfirm.com

   ☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) 02/28/2019, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

   Eric Rodriguez (Debtor) - 11460 Prager Ave., Lake View Terrace, CA 91342
   Hon. Maureen A. Tighe, U.S. Bankruptcy Court, Central Dist., CA, 21041 Burbank Blvd., Ste. 324, Ctrm. 302, Woodland Hills, CA 91367

   ☐ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

   ☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 02/28/2019 | Frank E. Marchetti | *[signature]* |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                           F 9013-3.1.PROOF.SERVICE